IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 18-00145-01-CR-W-BP |
| ) | |
| BOBBY R. DAVIS, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant's Motion to Suppress Evidence and Statements. (Davis Mot. to Suppress Evidence and Statements; Doc. #26.) For the reasons set forth below, it is recommended that the motion be denied.

I. INTRODUCTION

On June 5, 2018, the grand jury returned a one-count indictment against defendant Bobby R. Davis. The indictment charges that on May 8, 2018, defendant, having been convicted of at least three crimes punishable by imprisonment for terms exceeding one year that are either serious drug offenses or violent felonies as defined in 18 U.S.C. § 924(e)(2), knowingly possessed, in and affecting commerce, firearms, to wit: a Diamondback DB9 9mm handgun and a Remington Model 1100 shotgun, which had been transported in interstate commerce.

On April 11, 2019, an evidentiary hearing was held on defendant's motion to suppress. Defendant Davis was represented by Assistant Federal Public Defender Robert G. Kuchar. The Government was represented by Assistant United States Attorney Matthew A. Moeder. The Government called Detective Jarrel Berryman, Officer Blayne Newton, and Detective Troy

Schwalm of the Kansas City, Missouri Police Department as witnesses. The defense called Mark Wolpink, an investigator for the Federal Public Defender's Office, defendant Bobby Davis, and Dayna West to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On May 8, 2018, Officer Blayne Newton was patrolling as a one-person crew. (Tr. at 46-47.) At approximately midnight, Officer Newton observed a silver Pontiac with an expired temporary license plate. (Tr. at 47; Gov. Exh. 5 at 00:24-00:31.) This vehicle stood out to Officer Newton because it matched the description of a vehicle that had run from Officer Newton the previous night. (Tr. at 47.) Officer Newton attempted to initiate a traffic stop. (Tr. at 47.) The vehicle refused to stop and fled northbound at a high rate of speed. (Tr. at 48.) Officer Newton was not able to get a description of the driver or even determine how many occupants were inside the vehicle. (Tr. at 49.) Officer Newton initially followed the vehicle, but stopped the pursuit when he decided the traffic charge was not worth the risk involved with a high speed chase. (Tr. at 48.) Officer Newton communicated the incident to dispatch. (Tr. at 48; Gov. Exh. 5 at 00:01-00:39.)

2. Detective Jarrel Berryman (then a patrol officer) was working the Dog Watch (9:00 p.m. to 7:00 a.m.) with his partner, Officer Wasmer. (Tr. at 7.) At approximately midnight, dispatch reported that a Pontiac G6 had fled from Officer Newton when he attempted to stop the vehicle for a traffic violation. (Tr. at 8-9; Gov. Exh. 5 at 00:40-01:09.) Soon thereafter, Detective Berryman observed a silver Pontiac G6 with a Missouri temporary tag. (Tr. at 9; Gov. Exh. 5 at 02:16-02:18.) Based on the description of the vehicle and the area where the vehicle was seen, Detective Berryman believed that the vehicle he observed was the same vehicle that had fled from Officer Newton. (Tr. at 9.) Detective Berryman and Officer Wasmer followed the vehicle and notified dispatch. (Tr. at 9.) Detective Berryman testified that initially, the vehicle was travelling at a normal speed and obeying all traffic laws. (Tr. at 10.) The officers did not activate their lights and siren. (Tr. at 9.) As the officers were following the vehicle, Detective Berryman was not able to get a description of the driver or even determine how many occupants were inside the vehicle. (Tr. at 10.)

3. Detective Berryman testified that then, all of a sudden, the vehicle took off at a high rate of speed northbound on Olive and failed to stop for any stop signs. (Tr. at 10.) The officers observed the vehicle spin out and lose control at 45th and Montgall.

2

(Tr. at 10.) At that point, the officers were two to three intersections behind the vehicle. (Tr. at 10.) Detective Berryman testified that he saw a black male wearing a black shirt and black shorts exit the passenger's side of the vehicle and run. (Tr. at 11, 27.) The subject ran northbound on Montgall from 45th Street. (Tr. at 11.) Detective Berryman communicated the description of a black male, black shorts, black shirt, short haircut and the direction that the subject ran to other officers through dispatch. (Tr. at 12, 18, 49; Gov. Exh. 5 at 03:05-03:30, 04:31.) Detective Berryman mistakenly stated that the subject ran northbound on Wabash from 45th Street, rather than northbound on Montgall from 45th Street. (Tr. at 51-52; Gov. Exh. 5 at 03:12.) Officer Newton testified that he heard over the air that the subject was headed northbound on Wabash. (Tr. at 49-50.) Officer Newton moved into the area. (Tr. at 49.) Officer Newton testified that there were not a lot of people out on foot at this time of night. (Tr. at 50.) Officer Newton considered this geographic area to be a high-crime area. (Tr. at 50.)

4. After the subject ran, Detective Berryman and Officer Wasmer cleared the vehicle to make sure there was no one inside the vehicle. (Tr. at 12-13.) Detective Berryman and Officer Wasmer then drove around the area looking for the subject who had run from the vehicle. (Tr. at 13, 18.) Officers were advised to set up a perimeter around the area to try to contain the subject. (Tr. at 13; Gov. Exh. 5 at 03:35.) Detective Berryman testified that the perimeter included the area of 41st and Wabash. (Tr. at 13-14.)

5. Detective Berryman and Officer Wasmer returned to the vehicle. (Tr. at 18.) At that point, Detective Berryman saw a pair of sandals about five or six feet from the passenger side of the vehicle. (Tr. at 19, 37-38.) Detective Berryman testified that he had not noticed the sandals the first time he approached the vehicle. (Tr. at 19.) Detective Berryman did not see whether the subject was wearing shoes when he fled from the vehicle. (Tr. at 12.) Detective Berryman then communicated through dispatch that the subject potentially was not wearing shoes. (Tr. at 19-20.) Detective Berryman testified that he could not say for certain whether the subject who fled the vehicle was wearing shoes or not. (Tr. at 20.) Officer Wasmer found an ID card. (Tr. at 35.) The officers did not pick up or examine the ID card. (Tr. at 35-36.) Detective Berryman testified that the officers did not collect the ID card; it stayed in the vehicle. (Tr. at 37.) The officers looked inside the vehicle to see if it contained any weapons or contraband. (Tr. at 36.)

6. Detective Berryman ran the vehicle's VIN. (Tr. at 20.) It came back as no record, meaning that it was not stolen or used in any other offense or crime. (Tr. at 20.) The temporary tag on the vehicle was expired. (Tr. at 20.)

7. Officer Newton testified that he observed a black male with short hair, wearing black shorts and a black t-shirt, who fit the description of the party that fled from

3

the vehicle, in close proximity to where the vehicle had wrecked out. (Tr. at 52.) The time proximity between when the subject had fled the vehicle and when Officer Newton saw this individual matching the description of the subject gave Newton even more reason to want to investigate this individual. (Tr. at 99.) Officer Newton testified that the individual he observed was two or three feet from the roadway and ten to twelve yards south of a residence at 41st and Wabash. (Tr. at 53.) Officer Newton testified that the individual appeared to be using a cell phone as a flashlight. (Tr. at 57.) Officer Newton testified that as he drove by, the individual "immediately . . . walks towards the back of the yard. I say walking, he wasn't sprinting, but he wasn't walking. He was moving at a brisk pace." (Tr. at 57.) The individual's actions signified to Officer Newton that he was trying to avoid Newton. (Tr. at 57.) Officer Newton testified that the individual stayed in the rear of the residence at 41st and Wabash on the grass and went into an alleyway behind 41st and Prospect. (Tr. at 57-58.) Officer Newton testified that the alleyway was accessible to the public. (Tr. at 61.) There was no gate to go through to access the alleyway. (Tr. at 61.) There was no sign stating that this area was private property. (Tr. at 61.) Officer Newton activated his lights, got out of his patrol vehicle, drew his weapon, and pursued the individual. (Tr. at 58.) Officer Newton testified that he believed that this individual was the subject who had fled from the vehicle that had just wrecked out. (Tr. at 58.) Officer Newton did not observe a green neon stripe on the individual's shorts until after he made contact with the individual. (Tr. at 58-59.)

8. Officer Newton had his gun drawn as he approached the individual. (Tr. at 62.) Officer Newton testified that he had his gun drawn because he believed that this individual was the subject who had fled from police, because he was in a high-crime area known for a lot of violent crime, because he was by himself, and because he needed a flashlight to see in the dark alleyway. (Tr. at 62.) Officer Newton's firearm had a flashlight affixed to it. (Tr. at 62.) Officer Newton ordered the individual to show his hands and to get on his stomach on the ground. (Tr. at 63.) Officer Newton observed that the individual had a small black object in his hand which Newton believed to be a firearm. (Tr. at 63-64.) Officer Newton testified that the individual turned his body and stuck his hand behind a piece of plywood that was leaning up against the building. (Tr. at 64.) When the individual came back with his hand, it was empty. (Tr. at 64.) The individual then complied with Officer Newton's commands. (Tr. at 64.) Officer Newton testified that he then handcuffed the individual. (Tr. at 64.) Officer Newton testified that the individual was not under arrest at that time, but he was detained for further investigation in regard to eluding officers. (Tr. at 65, 72.)

9. Officer Newton walked the individual back to his patrol vehicle and left him with another officer who had responded to the scene. (Tr. at 65, 95-96; Def. Exh. 3 at 12:20:39.) Officer Newton then returned to the alleyway to retrieve what he believed to be a firearm. (Tr. at 65, 96-97.) Officer Newton discovered a black

4

handgun behind the piece of plywood where Newton observed the individual stick his hand. (Tr. at 65; Gov. Exh. 8, 9.) Officer Newton retrieved the firearm. (Tr. at 67.) When the individual was made aware that Officer Newton had located a firearm, the individual volunteered that he was a felon. (Tr. at 72; Gov. Exh. 3 at 12:29:53.)

10. The individual Officer Newton detained was ultimately identified as Bobby Davis. (Tr. at 68.) Officer Newton contacted an investigative unit to verify that Davis was a felon. (Tr. at 72.) Once the investigative unit verified that Davis was a felon, Officer Newton placed Davis under arrest for being a felon in possession of a firearm. (Tr. at 72.) Detective Schwalm testified that the criminal history check of Davis also revealed that Davis had outstanding warrants for his arrest. (Tr. at 110.)

11. Officer Newton testified that defendant Davis dropped some keys right before Newton put him in handcuffs. (Tr. at 73.) Officer Newton picked up the keys, but did not attempt to use the keys to unlock any car or building. (Tr. at 73.) Officer Newton testified that he believed it to be illegal to use the keys to attempt to unlock a car or business that Davis claimed was his. (Tr. at 73-74.) Officer Newton testified that he did not look through Davis's cell phone because that would have been an illegal search. (Tr. at 74.)

12. Detective Berryman became aware that Officer Newton had apprehended a black male wearing a black shirt and black shorts near the area of 41st and Wabash. (Tr. at 21.) Officer Newton asked through dispatch if the subject had a green neon stripe down his shorts. (Tr. at 21, 59, 82; Gov. Exh. 5 at 05:36.) Detective Berryman responded that he could not deny or confirm the green stripe. (Tr. at 21, 59, 82-83; Gov. Exh. 5 at 05:38.)

13. Detective Berryman and Officer Newton each estimated the time between the subject running from the vehicle to the time Officer Newton apprehended defendant Davis to be approximately five minutes. (Tr. at 40, 60.) The time stamps from the dash cams on Detective Berryman's and Officer Newton's vehicles would suggest the time lapse was closer to four minutes. (Gov. Exh. 2 at 12:12:45; Gov. Exh. 3 at 12:16:55.) Detective Berryman estimated the distance between 45th and Montgall and 41st and Wabash to be roughly half a mile, four blocks north and one block west. (Tr. at 22.)

14. Detective Berryman responded to 41st and Wabash. (Tr. at 25.) He was not able to confirm whether the subject detained by Officer Newton was or was not the person he saw flee from the vehicle. (Tr. at 25.) While Detective Berryman confirmed that the subject detained by Officer Newton had a bright fluorescent stripe down the sides and on the bottom of his shorts, Berryman testified that from the distance he saw the subject flee, he would not have been able to see a stripe on

5

the subject's shorts. (Tr. at 29-30.) Detective Berryman testified that the subject detained by Officer Newton did match the description of the person Berryman saw flee from the Pontiac. (Tr. at 25.)

15. Detective Troy Schwalm interviewed defendant Davis at the police station. (Tr. at 110.) Detective Schwalm advised Davis of his *Miranda* rights, both orally and in written format at 4:39 a.m. (Tr. at 110-12; Gov. Exh. 4 at 03:44-04:30; Gov. Exh. 17.) Detective Schwalm testified that Davis agreed to waive his rights and speak with Schwalm. (Tr. at 111.) Davis signed the *Miranda* Warning and Waiver form. (Tr. at 112; Gov. Exh. 4 at 04:30; Gov. Exh. 17.) Detective Schwalm testified that he did not put any pressure or other force on Davis to talk with him. (Tr. at 111.) During the interview, Davis denied possession of the firearm that was recovered in the alleyway, but acknowledged that he had possession of another firearm at his residence at 3401 Monroe Avenue, Kansas City, Missouri. (Tr. at 114; Gov. Exh. 4 at 18:16-18:35.) Davis also acknowledged that he was a felon and that he knew he should not have guns. (Tr. at 115; Gov. Exh. 4 at 19:33-19:40.)

16. Based on Davis's statements that he was a felon and that he knew he should not have guns, but that he did possess a firearm at his residence, Detective Schwalm asked officers in his unit to apply for a search warrant for 3401 Monroe Avenue. (Tr. at 114-15; Gov. Exh. 18.) The Application for Search Warrant provided:

> On 05-08-2018 at approximately 0008 hours, Officer Newton with KCMOPD's Metro Patrol Division observed a gold Pontiac G6 traveling northbound in the area of 59th Street and Michigan Avenue. Officer Newton determined the vehicle had a temporary permit which expired in March, 2018 so he activated his emergency lights in order to initiate a traffic violation of the vehicle. The driver of the Pontiac G6 refused to stop for the pursuing Police vehicle so Officer Newton discontinued the pursuit per department policy.
>
> On 05-08-2018 at approximately 0011 hours, Officer Berryman and Officer Wasmer, also with KCMOPD's Metro Patrol Division observed the same Pontiac G6 near Emanuel Cleaver II Boulevard and Euclid Avenue. The driver of the Pontiac again fled at the sight of the Police car until he lost control in the area of 45th Street and Montgall Avenue. The Officers observed a black male wearing a black shirt and black pants or shorts exit the vehicle and run northbound on Montgall Avenue.
>
> Officer Newton responded to the area to assist with an area canvass for the subject who fled from the Pontiac and observed a black male

6

wearing a black shirt and black shorts run behind 4101 Wabash Avenue, Kansas City, Jackson County, Missouri. Officer Newton pursued the subject behind the residence where he located the subject, later identified as Bobby R. Davis (B/M 02-13-1979). Officer Newton followed Davis as he ran to the back of 4100 Prospect Avenue and observed a small black handgun in his right hand. Officer Newton then observed Davis raise his arm and place his hand behind a piece of plywood that was leaning against a wall behind 4100 Prospect Avenue. When his hand reappeared, he no longer had the gun in his hand. Officer Newton took Davis into custody and once other Officers responded to assist him, he retrieved the small black handgun from behind the piece of plywood and identified it as a Diamondback DB9, 9mm semi-automatic handgun bearing serial number YC4419. The handgun was loaded with five live rounds of ammunition. The Officers determined that the handgun was a stolen firearm.

A review of Davis' prior criminal convictions revealed the following:

1. On 02-25-1998, Davis was found guilty of 2nd Degree Drug Trafficking (Class B Felony) under Jackson County Circuit Court Case number 16CR97009078-01. Davis was given a Suspended Imposition of Sentence (SIS) with three years' probation. The probation was subsequently revoked on 10-15-1999 and he was sentenced to 10 years imprisonment.
2. On 06-22-1999, Davis was found guilty of 2nd Degree Robbery (Class B Felony) under Jackson County Circuit Court Case number 16CR98001837-01. Davis was sentenced to 15 years imprisonment.
3. On 06-22-1999, Davis was found guilty of Stealing (Class C Felony) under Jackson County Circuit Court Case number 16CR98001838-01. Davis was sentenced to 7 years imprisonment.
4. On 06-22-1999, Davis was found guilty of three counts of Distribution of a Controlled Substance (Class B Felony) under Jackson County Circuit Court Case number 16CR98007036-01. Davis was sentenced to 15 years imprisonment.
5. On 06-21-1999, Davis was found guilty of two counts of Distribution of a Controlled Substance (Class A Felony) and one count of the Possession of a Controlled Substance (Class C Felony) under Jackson County Circuit Court Case number 16CR99002621-01. Davis was sentenced to 20 years imprisonment.

> On 05-08-2018 at 0436 hours, Det. Schwalm with the Kansas City Missouri Police Department's Illegal Firearms Squad interviewed Davis at the South Patrol Division Station. Davis said he understood his rights, signed the Miranda Waiver form, and agreed to participate in the interview. During the interview, Davis denied possessing the firearm recovered from behind 4100 Prospect Avenue, Kansas City, Jackson County, Missouri. Davis told the detective he was a felon and knew he wasn't supposed to be around guns. However, Davis admitted that he owned a gun but he said it was secured within his residence, located at 3401 Monroe Avenue, Kansas City, Jackson County, Missouri.
>
> 05-08-2018 at approximately 0900 hours, Detectives drove past 3401 Monroe Avenue in an attempt to confirm that Davis lived at the location. They located a Ford Mustang parked at the residence which was registered to Davis' girlfriend.
>
> Due to the fact that Davis is a convicted felon and thus prohibited from possessing a firearm, the Affiant is requesting a search warrant for Davis' residence, located at 3401 Monroe Avenue, Kansas City, Jackson County, Missouri to retrieve the firearm he stated he owned and kept within the house.

   (Gov. Ex. 18.) A search warrant was obtained through Jackson County, Missouri, at 10:02 a.m. (Tr. at 115; Gov. Exh. 19.) Detective Schwalm testified that if Davis had not stated that he had a firearm in his house, the officers would not have sought a search warrant. (Tr. at 115.)

17. The search warrant was executed at 3401 Monroe Avenue and a Remington 12-gauge shotgun that had been modified by the handle being cut off and the barrel being shortened was recovered from a bedroom closet. (Tr. at 116-17.)

18. After the discovery of the shotgun at 3401 Monroe Avenue, Detective Schwalm conducted a second interview with defendant Davis. (Tr. at 117-18.) Davis was reminded of his *Miranda* rights. (Tr. at 118.) Detective Schwalm testified that Davis acknowledged that he knew he did not have to talk to Schwalm. (Tr. at 118.) Davis admitted to possession of the Remington shotgun. (Tr. at 118.)

19. Detective Schwalm testified that he determined that defendant Davis was associated with a company called Reality Records One. (Tr. at 119, 121.) Reality Records One was located at 4104 Prospect, the address where the handgun was recovered. (Tr. at 121.)

20. Defendant Davis and Dayna West each testified that Davis and West had been inside the building where Davis's business is located from about 8:30 p.m. to midnight. (Tr. at 147, 158, 160-61.) At about midnight, Davis walked Ms. West to her car. (Tr. at 147, 161.) Davis testified that as he was walking back to the building, this incident occurred. (Tr. at 147.) Davis testified that the public entrance is at the front of the building which is on Prospect. (Tr. at 148.) Davis testified that the rear entrance to the building, where this incident occurred, is not a public entrance. (Tr. at 148.) Davis testified that he considers the area on the back side of the building to be private. (Tr. at 149.) Davis testified that he did not give permission for Officer Newton or anyone else to be on his private property that night. (Tr. at 149.)

21. Dayna West testified that she accessed Reality Records through the door located at the back of the building. (Tr. at 163.) Ms. West considered this door to be the public entryway to the studio. (Tr. at 163.) When asked what time Reality Records closes for the day, Ms. West responded:

> That would be up to Bobby because, you know, and also whenever he collaborated with people. So, like I said, his work ethic is impeccable, so it would be all hours of the night whenever anyone was available. Because that's actually why I was there so late because I had to work during the day. So, we got together later.

(Tr. at 163.)

## III. DISCUSSION

Defendant Davis seeks to suppress all evidence (i.e., the handgun, the shotgun, and all incriminating statements) arguing the evidence resulted from an unlawful arrest. Specifically, defendant argues that the officers did not have probable cause to detain and arrest him. (Davis Mot. to Suppress Evidence and Statements at 7-14; Doc. #26.) Defendant further argues that the handgun must also be suppressed as it was recovered during an unlawful search of the curtilage of defendant's business. (*Id.* at 14-15.) In his reply brief, defendant argues that the shotgun must also be suppressed because the search warrant for his residence was based on the statement he gave after he was unlawfully detained and arrested. (Davis Reply at 8; Doc. #31.) In addition, defendant makes a *Franks* challenge to the affidavit provided in support of the search warrant

9

application.  (*Id.* at 8-9.)

A.      The Constitutionality of the Stop

Both investigative stops and arrests are seizures.  However, an investigative stop need only be supported by a reasonable, articulable suspicion that criminal activity may be afoot, whereas an arrest must be supported by probable cause.  *See Terry v. Ohio*, 392 U.S. 1, 25-31 (1968).  In determining whether an officer had reasonable suspicion to conduct an investigative stop, the court must look at the totality of the circumstances to see whether the detaining officer had a particularized and objective basis for suspecting legal wrongdoing.  *See United States v. Montgomery*, 828 F.3d 741, 743-44 (8th Cir. 2016).

The record in this case establishes that on May 8, 2018, at approximately midnight, Officer Newton attempted to initiate a traffic stop on a vehicle that refused to stop and fled at a high rate of speed.  (Fact No. 1.)  Officer Newton communicated the incident to dispatch.  (*Id.*)  Shortly thereafter, Detective Berryman observed a vehicle that he believed to be the same vehicle that had fled from Officer Newton.  (Fact No. 2.)  The vehicle took off at a high rate of speed and failed to stop for stop signs.  (Fact No. 3.)  Detective Berryman observed the vehicle spin out and lose control at 45th and Montgall.  (*Id.*)  At that point, Detective Berryman was two to three intersections behind the vehicle.  (*Id.*)  Detective Berryman saw a black male wearing a black shirt and black shorts exit the passenger's side of the vehicle and run.  (*Id.*)  The subject ran northbound on Montgall from 45th Street.  (*Id.*)  Detective Berryman communicated the description of a black male, black shorts, black shirt, short haircut and the direction that the subject ran to other officers through dispatch.  (*Id.*)  Detective Berryman mistakenly stated that the subject ran northbound on Wabash from 45th Street, rather than northbound on Montgall from

10

45th Street. (*Id.*) Officer Newton testified that he heard over the air that the subject was headed northbound on Wabash. (*Id.*) There were not a lot of people out on foot at this time of night. (*Id.*) Officer Newton observed a black male with short hair, wearing black shorts and a black t-shirt, which fit the description of the party who fled from the vehicle, at 41st and Wabash, four blocks from where he had been advised that the vehicle had wrecked out at 45th and Wabash. (Fact Nos. 3, 7.) Officer Newton observed this individual four to five minutes after the subject had fled the vehicle. (Fact Nos. 13.) The individual Officer Newton observed was not on a sidewalk, appeared to be using a cell phone as a flashlight, and moved at a brisk pace behind a residence as Officer Newton drove by him. (Fact No. 7.) The individual's actions signified to Officer Newton that he was trying to avoid Newton. (*Id.*) Officer Newton believed that this individual was the subject who had fled from the vehicle, given the description of the subject, the close proximity to the location where the vehicle had wrecked out, the short time that had elapsed, and the individual's actions. (*Id.*) Officer Newton stopped the individual to investigate. (Fact No. 8.)

The Court finds the testimony of Officer Newton to be credible. The Court further finds that Officer Newton had a reasonable, articulable suspicion that the individual he stopped was the subject involved in eluding officers given the description of the suspect as a black male with short hair, wearing black shorts and a black shirt who was on foot (defendant Davis is a black male with short hair who was wearing black shorts and a black t-shirt, and was walking), the location where the vehicle had wrecked out (the stop took place approximately five blocks from the location of the vehicle), the timing of the stop (approximately four to five minutes after the subject ran from the vehicle), and the actions of the individual (who was not on a sidewalk, who appeared to be

11

using a cell phone as a flashlight, and who moved at a brisk pace behind a residence as Officer Newton drove by him). Thus, the Court finds that Officer Newton was justified in conducting an investigative stop. *See United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016)("a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion").

B. The Seizure of Defendant Davis

"[A] police officer may take steps reasonably necessary to protect his or her personal safety and the safety of others and to maintain the status quo of a situation while verifying or dispelling suspicion in a short period of time." *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)(citing *United States v. Jones*, 759 F.2d 633, 636-37 (8th Cir.), *cert. denied*, 474 U.S. 837 (1985)). In *Seelye*, the Court found that the officer's use of force in physically restraining and ordering the defendant out of an apartment at gunpoint did not exceed the amount of force appropriate to an investigative stop. 815 F.2d at 50. Protective measures also allow for the use of handcuffs. *See United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013)("[p]olice officers reasonably may handcuff a suspect during the course of a *Terry* stop to protect their personal safety"); *United States v. Walker*, 555 F.3d 716, 721 (8th Cir. 2009); *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006), *cert. denied*, 549 U.S. 1272 (2007).

The record in this case establishes that Officer Newton had his gun drawn as he approached the individual (defendant Davis). (Fact No. 8.) Officer Newton testified that he had his gun drawn because he believed that this individual was the subject who had fled from police, because he was in a high-crime area known for a lot of violent crime, because he was by himself, and because he needed a flashlight to see in the dark alleyway and his firearm had a flashlight affixed

12

to it. (*Id.*) Officer Newton observed that the individual had a small black object in his hand which Newton believed to be a firearm. (*Id.*) Officer Newton ordered Davis to the ground and placed him in handcuffs. (*Id.*)

Again, the Court finds the testimony of Officer Newton to be credible. The Court further finds that Officer Newton had a reasonable concern for officer safety. The actions taken by Officer Newton were necessary to protect his personal safety and to maintain the status quo while investigating whether the subject was involved in eluding officers. No constitutional violation took place.

C. The Arrest of Defendant Davis

As Officer Newton approached defendant Davis, he observed that Davis had a small black object in his hand which Newton believed to be a firearm. (Fact No. 8.) Officer Newton testified that Davis turned his body and stuck his hand behind a piece of plywood that was leaning up against the building. (*Id.*) When Davis came back with his hand, it was empty. (*Id.*) Officer Newton walked Davis back to his patrol vehicle and left him with another officer who had responded to the scene. (Fact No. 9.) Officer Newton then returned to the alleyway to retrieve what he believed to be a firearm. (*Id.*) Officer Newton discovered a black handgun behind the piece of plywood where Newton observed Davis stick his hand. (*Id.*) Officer Newton later determined that Davis was a convicted felon and placed Davis under arrest for being a felon in possession of a firearm. (Fact No. 10) There was no constitutional violation.

D. Fruit of the Poisonous Tree

Defendant Davis argues that because the evidence against him was obtained as a direct result of an unreasonable stop, detention, and arrest in violation of the Fourth Amendment, the

13

evidence should be suppressed as fruit of the poisonous tree. (Davis Mot. to Suppress Evidence and Statements at 12-13; Doc. #26.) Under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of evidence obtained directly or indirectly through the exploitation of police illegality. *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). As set forth above, the Court finds that the investigative stop, the seizure, and the arrest of defendant Davis were lawful. Therefore, defendant Davis's fruit of the poisonous tree argument must fail.

E.     Seizure of the Handgun

Defendant Davis argues that the handgun must be suppressed because the police did not have a warrant to search the property behind defendant's place of business. (Davis Mot. to Suppress Evidence and Statements at 14; Doc. #26.) Defendant Davis claims that he had a reasonable expectation of privacy in the curtilage behind his business as "[t]he back door to the business was not a normal means of entry that a customer would use." (*Id.*) Further, "[t]here was no implied invitation for the public to enter the area during regular business hours, let alone at midnight." (*Id.* at 15.)

While defendant Davis testified consistently with the argument that the property behind the business was private and not open to the public (Fact No. 20), other testimony presented at the hearing does not support this argument. Dayna West, called to testify on behalf of the defense, testified that she accessed Reality Records through the door located at the back of the building. (Fact No. 21.) Ms. West considered this door to be the public entryway to the studio. (*Id.*) When asked what time Reality Records closes for the day, Ms. West responded that the business could be open "all hours of the night whenever anyone was available." (*Id.*) Officer Newton

14

testified that the alleyway into which he followed the defendant was accessible to the public, that there was no gate to go through to access the alleyway, and that there was no sign stating that the area was private property. (Fact No. 7.) The Court finds that on this record, the handgun was not located within an area where defendant Davis had a reasonable expectation of privacy.

However, even if the Court assumes that defendant Davis had a reasonable expectation of privacy in this area, both probable cause and exigent circumstances justified the search. *See United States v. Fountain*, No. 3:13cr49/MCR, 2013 WL 4833090 (N.D. Fla. Sept. 10, 2013). In *Fountain*, an officer, who was responding to a call that there had been a shooting at a home, observed a man (defendant Fountain) standing in a driveway about a block away from the scene of the shooting holding a revolver in his hand. *Id.* at *1. When defendant Fountain saw officers approaching him in a marked police car, he walked back into his yard, was momentarily out of the officers' view, and then returned to the street. *Id.* Defendant Fountain was handcuffed and an officer walked to the area where Fountain had momentarily gone and saw a revolver lying on the ground. *Id.* at *2. A background check confirmed that defendant Fountain was a convicted felon and he was arrested. *Id.* Defendant Fountain moved to suppress all evidence seized as a result of his contact with law enforcement officers and the search of his yard. *Id.* at *1. Defendant Fountain argued that the officers' warrantless search of the curtilage of his home without consent violated the Fourth Amendment. *Id.*

In response to defendant Fountain's argument that the warrantless search for the gun in his yard violated his Fourth Amendment rights, the court stated:

> A search of a protected area such as the curtilage of a home is justified if supported by probable cause and a warrant. A "warrantless search is 'presumptively unreasonable'" but is permitted where "both probable cause and exigent circumstances exist." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir.

15

1991), *cert. denied*, 502 U.S. 907 (1991). "Probable cause exists when under the 'totality-of-the-circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983))(internal alteration omitted). A sufficient connection between the object and the place to be searched can be established "from the particular circumstances involved and need not rest on direct observation." *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011)(internal marks omitted). Exigent circumstances exist where there is "'compelling need for official action and no time to secure a warrant.'" *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002)(quoting *Michigan v. Tyler*, 436 U.S. 499, 509 (1978), *cert. denied*, 537 U.S. 1161 (2003)). The mere presence of contraband alone does not create exigent circumstances unless there is a danger that evidence will be destroyed or removed or there is a danger to the public or the officers. *See id.* at 1334–35; *see also Tobin*, 923 F.2d at 1510.

* * *

Even assuming this area was within the curtilage, both probable cause and exigent circumstances justified the search. Again, Agent Woolcock had seen Fountain openly holding a weapon, and the officers saw him walk directly to the tree lined boundary of the yard, momentarily out of sight, when he saw them approach in a marked police vehicle. This created a fair probability that a gun would be found in that location. Also, the circumstances presented an obvious public safety risk—the gun was along the property line in a residential area not far from the public street and thus posed a danger to officers and the public, especially in the context here where a shooting had recently occurred nearby, an investigation was underway but the suspects of that crime had not been apprehended, and at the time of the search, the officers did not yet know whether Fountain might have been involved in the nearby shooting, which was unquestionably a violent offense. . . . The court finds that exigent circumstances supported the officer's brief entry onto the yard along the property line to locate the gun. . . .

*United States v. Fountain*, No. 3:13cr49/MCR, 2013 WL 4833090, at *5-6 (N.D. Fla. Sept. 10, 2013).

In the case before this Court, Officer Newton stopped defendant Davis to investigate whether Davis was the subject involved in eluding officers. Officer Newton saw a small black object in Davis's hand which Newton believed to be a firearm. (Fact No. 8.) Before complying with Officer Newton's commands to show his hands and to get on his stomach on the ground,

16

Davis turned his body and stuck his hand behind a piece of plywood that was leaning up against the building, disposing of the small black object. (*Id.*) The area was accessible to the public. (Fact No. 7.) The Court finds that there was a fair probability that a gun would be found behind the piece of plywood, that there was a fair probability that this gun was evidence of a crime given Davis's attempt to hide it from the officer, and that this gun presented a public safety risk, posing a danger to both officers and the public. The search for and seizure of the gun did not violate the Fourth Amendment.

F.     Search Warrant for Defendant's Residence

Finally, defendant Davis argues that the shotgun seized from his residence must be suppressed because the search warrant for his residence was based on a statement he gave after he was unlawfully detained and arrested and because the search warrant application was misleading. (Davis Reply at 8-9; Doc. #31.)

As set forth above, the Court finds that the investigative stop, the seizure, and the arrest of defendant Davis were lawful. Defendant's statement was not the fruit of any illegal action and was properly presented in support of the application for search warrant.

In support of his argument that the search warrant application was misleading, defendant states:

> . . . The warrant application recited the circumstances surrounding Mr. Davis' arrest as if he were the man who fled from the police in the gold Pontiac, nowhere clarifying that the police had arrested the wrong person. The warrant application created the false impression that Mr. Davis was lawfully detained as the driver of the Pontiac and arrested a short time later after Officer Newton saw him holding a handgun and learned he was a felon. The warrant application did not include Officer Newton's statements at the scene, "whatever you had in your hand is no longer in your hand" and "I'll go see if he tossed anything," which certainly indicate that Officer Newton had seen an unidentified object, not a handgun.

17

> Had the warrant application accurately recited the circumstances of Mr. Davis' arrest, it is likely that the magistrate judge would not have found probable cause to justify a search of Mr. Davis' residence. The magistrate judge would have realized that Mr. Davis' statement to Detective Schwalm was the fruit of a Fourth Amendment violation.

(Davis Reply at 8-9; Doc. #31.)

The United States Supreme Court has set forth the following with respect to what is required for a valid search warrant:

> The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." . . . [T]his Court has interpreted [these words] to require only three things. First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense. Finally, "warrants must particularly describe the 'things to be seized,'" as well as the place to be searched.

*Dalia v. United States*, 441 U.S. 238, 255 (1979)(citations omitted).

The Eighth Circuit Court of Appeals has set forth the following with respect to warrant affidavits that are found to contain falsehoods or omissions:

> A facially valid warrant affidavit is constitutionally infirm if the defendant establishes that the affidavit includes deliberate or reckless falsehoods that, when redacted, render the affidavit's factual allegations insufficient to support a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 171 (1978).[1] Omissions likewise can vitiate a warrant if the defendant proves "first that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading, and, second, that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *United States v. Allen*, 297 F.3d 790, 795 (8th Cir. 2002).

---

[1] In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the Supreme Court held that if it is shown by a preponderance of the evidence that a warrant affidavit includes a false statement made knowingly and intentionally or with reckless disregard for the truth and if, with the affidavit's false material excluded, the affidavit is insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."

18

*United States v. Ketzeback*, 358 F.3d 987, 990 (8th Cir. 2004)(footnote supplied).

Contrary to defendant Davis's argument, the Court does not believe that the subject affidavit was misleading. The information provided with respect to the man who fled from the police gives the context for which defendant Davis was stopped, but this information does not provide probable cause to search the residence at 3401 Monroe Avenue. The information provided with respect to the black handgun is consistent with the facts presented at the suppression hearing. These facts are that Officer Newton observed that defendant Davis had a small black object in his hand which Newton believed to be a firearm, that Davis turned his body and stuck his hand behind a piece of plywood that was leaning up against the building, that when Davis came back with his hand, it was empty, and that Newton retrieved a black handgun from behind the piece of plywood. (Fact Nos. 8 and 9.) But, again, this information does not provide probable cause to search the residence at 3401 Monroe Avenue. The Court finds that the factual allegation that "Davis told the detective he was a felon and knew he wasn't supposed to be around guns," but "admitted that he owned a gun [and that] it was secured within his residence" (Fact No. 16) was sufficient to support a finding of probable cause that property constituting evidence of the commission of a crime would be found within the residence. Thus, even if the information concerning the circumstances surrounding defendant Davis's stop, detention, and arrest, and the information concerning the seizure of the handgun were redacted from the affidavit (which the Court does not find necessary as this information was not misleading), Davis's statement provides sufficient probable cause to support the search warrant. Given the Court's finding that defendant's statement was not the fruit of any illegal action and was properly presented in support of the application for search warrant, the Court finds that defendant is not entitled to the

19

suppression of any evidence under *Franks*.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Davis's Motion to Suppress Evidence and Statements (Doc. #26).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge